Eugene BEARD, et al., Appellants,

v.

GOODYEAR TIRE & RUBBER
COMPANY, et al., Appellees.

Eugene BEARD, et al., Appellants,

v.

SAKS FIFTH AVENUE INC., Appellees.

Eugene BEARD, et al., Appellants,

v.

WOODWARD & LOTHROP
INC., Appellee.

Eugene BEARD, Appellant,

v.

MAY DEPARTMENT STORES INC.,
et al., Appellees.

GOODYEAR TIRE & RUBBER
COMPANY, Appellant,

v.

Eugene BEARD, et al., Appellees.

Nos. 86–1327, 86–1329, 86–1330,
87–464 and 87–1457.

District of Columbia Court of Appeals.

Argued Oct. 25, 1990.
Decided Feb. 26, 1991.

Philip Clarke Baten,· for Beard.

Peter K. Tompa, with whom Kevin Murphy, Sheldon Feldman, James C. Gregg, John Grosz, and William McMurtrie, were on the brief, for Goodyear Tire & Rubber Co., CRSI, Saks Fifth Ave., Inc. and J.C. Penney.

Robert P. Scanlon, for Woodward & Lothrop, Inc.

Before ROGERS, Chief Judge, and SCHWELB and FARRELL,* Associate Judges.

SCHWELB, Associate Judge:

This case originated in 1983 as a debt collection action by May Department Stores (Hecht's) against Eugene Beard and Alberta Roberts to recover funds charged to a credit card in Beard's name. Beard counterclaimed against Hecht's, alleging in substance that the credit card had been fraudulently obtained in his name by Ms. Rob-

---

* Associate Judge Belson has recused himself from these appeals. Associate Judge Farrell was drawn to replace him.

erts, a former girlfriend, without his knowledge or consent. Beard claimed that Hecht's had negligently issued the card without verifying the information on the application. He maintained that as a result of the disclosure of the purportedly due balances to CBI, a credit reporting company, his credit rating and creditworthiness had been substantially impaired. Beard joined as additional counter-defendants a number of other retail merchants which had likewise allegedly issued credit cards in his name, or jointly in his name and in his erstwhile inamorata's name, upon Ms. Roberts' unauthorized application. This case, now No. 87–464, came to be known as *Beard I*.[1]

Beard and a second plaintiff, Bernice Elam, subsequently brought a separate suit against several of his adversaries in *Beard I*, alleging violations of the consumer protection laws. The gravamen of the new complaint was that these companies had failed to register as retail creditors, as required by the District of Columbia Consumer Retail Credit Regulations, 16 DCMR § 102.1 (1987). This case, now Nos. 86–1327 through 86–1331, came to be known as *Beard II*.[2] *Beard I* and *Beard II* have been consolidated for purposes of this appeal.

In the trial court, Judge von Kann granted summary judgment in favor of the merchants in *Beard I*, Judge Hannon did the same in *Beard II*, Judge von Kann denied the merchants' request for Rule 11 sanctions, and Judge Nunzio imposed discovery sanctions against Beard for failure to respond in timely fashion to interrogatories propounded by Woodward & Lothrop, which was one of the merchant defendants.

These decisions are now before us on appeal.

# I

## BEARD I—COUNT I

### A. *The Contentions of the Parties.*

In the first count of his counterclaim in *Beard I*, Beard alleged that the various merchants had negligently accepted fraudulent credit applications from Ms. Roberts and had reported unfavorable credit information about Beard to CBI after the accounts began to show deficiencies. He maintains that the merchants were necessarily negligent because, if they had exercised due care, they would not have issued credit cards for which he did not apply, and would have averted the injury to his credit rating which followed the unauthorized charges on those cards by Ms. Roberts. More specifically, he contends that the merchants failed to verify the information on the applications, *e.g.* by checking with his employer. As a second string to his bow, Beard alleges that the merchants were negligent in that they did not adhere to their own review procedures, as described in affidavits and responses filed by the merchants in connection with this litigation.

Following substantial discovery, the various merchants filed motions for summary judgment. In support of their motions, they relied on affidavits and sworn answers to interrogatories describing the processing procedures which, according to the merchants, had been followed in regard to the applications in this case. These procedures varied in some measure from merchant to merchant, but none included an automatic inquiry with the applicant's em-

---

1. The merchants who were originally parties in *Beard I* were May Department Stores, Inc. (Hecht's), Goodyear Tire & Rubber Co., Raleigh Stores, Inc., Allied Stores Corp. (Garfinkels), Woodward & Lothrop Inc., Saks Fifth Avenue, Inc., Credit Bureau Inc. (CBI), and J.C. Penney. Hecht's and CBI have settled with Beard and are not parties to this appeal. Proceedings as to Garfinkels and Raleigh Stores, Inc., which both are now owned by Garfinkels Holding Co., have been stayed pursuant to 11 U.S.C. § 362(a) (1988). We therefore decide *Beard I* only as to Goodyear, Woodward & Lothrop, Saks, and J.C. Penney.

2. The merchants who were originally parties in *Beard II* were Hecht's, Goodyear, Citicorp Retail Services Inc. (CRSI) (which had bought Beard's account from Goodyear), Raleigh's, Garfinkels, Saks, and Woodward & Lothrop. Hecht's has settled with Beard and is not a party to this appeal. Proceedings as to Garfinkels and Raleigh's have been stayed. See note 1, *supra*. We therefore decide *Beard II* only as to Goodyear, CRSI, Saks, and Woodward & Lothrop.

ployer to verify information on the application. Some affiants described their procedures as "quite thorough and ... consistent with the credit application review procedures utilized throughout the retail industry" (Goodyear) or as "recognized and in accordance with the credit application and review procedures used by many members of the credit industry" (Woodward & Lothrop).[3] Claiming, among other things, that there was no evidence of negligence, the merchants prayed for judgment dismissing the counterclaim.

In response to the merchants' motions, Beard filed an affidavit in which he asserted that he had not authorized the credit card applications. He also submitted an affidavit by an investigator to the effect that, according to pertinent records, the merchants had not contacted his employer, Howard University, to verify information on the applications. Beard did not submit any affidavit from an expert, nor did he attempt in any other way to define the standard of care applicable to these merchants or to identify the respects in which the merchants had failed to adhere to that standard. Rather, he basically relied on the doctrine of *res ipsa loquitur* or some improvised variant thereof.[4]

■ Judge von Kann granted the merchants' motions for summary judgment, holding that Beard had failed to present any evidence of negligence and that he was contributorily negligent as a matter of law.[5] We affirm the judge's holding with respect to negligence on the ground that expert testimony was required to establish the applicable standard of care and any

deviation therefrom. Since Beard presented no affidavit or other sworn statement from an expert, the record presents no triable issue of fact with regard to Beard's allegations of negligence. We do not reach the other issues addressed by the parties.[6]

## B. Summary Judgment Standards.

To prevail upon a motion for summary judgment, the moving party must clearly demonstrate that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. *Holland v. Hannan*, 456 A.2d 807, 814 (D.C. 1983). The evidence is viewed in the light most favorable to the party opposing the motion, *Truitt v. Miller*, 407 A.2d 1073, 1077 (D.C.1979), and that party is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials. *Holland, supra*, 456 A.2d at 815.

If a moving defendant has made an initial showing that the record presents no genuine issue of material fact, then the burden shifts to the plaintiff to show that such an issue exists. *Landow v. Georgetown–Inland West Corp.*, 454 A.2d 310, 313 (D.C.1982). The defendant's initial showing can be made by pointing out that there is a lack of evidence to support the plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Conclusory allegations by the nonmoving party are insufficient to establish a genuine issue of material fact or to defeat the entry of summary judgment. *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 349 (D.C. 1987) (per curiam). Rather,

> *Beard's Answer to No. 19.* An account was established with Goodyear in my name. I had no knowledge of this account, nor did I authorize this account. *It could only have been opened by negligence.*
> (Emphasis added).

3. Unlike several of the other merchants, Woodward & Lothrop approved credit applications *without requiring a credit report* where those applications, on their face, reflected "point scores" of 183 based on occupation, level of position, etc. Other merchants routinely required a credit report and compared the information in the report with that in the application.

4. *Goodyear's Interrogatory No. 19.* State specifically the facts upon which you rely to support your contention that this counter-defendant "negligently accepted a fraudulent credit application from one Albertha Roberts."

5. The claim of contributory negligence was predicated on Beard's alleged failure to act promptly upon discovery of Ms. Roberts' purportedly unauthorized conduct.

6. The merchants also contend that the first count of Beard's counterclaim is preempted by the Fair Credit Reporting Act, 15 U.S.C. § 1681 to 1681t (1982).

an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial.

Super.Ct.Civ.R. 56(e). Moreover, affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.*

To summarize, the test for deciding a motion for summary judgment is essentially the same as that for a motion for a directed verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–53, 106 S.Ct. 2505, 2512–13, 91 L.Ed.2d 202 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989).

*C. The Practice in the Industry.*

[2] The affidavits and other materials submitted by the merchants represent that their review procedures conform to those generally used by members of their industry, or at least by many of them. Such evidence is undoubtedly relevant to the issue of negligence. *Princemont Constr. Corp. v. Smith,* 140 U.S.App.D.C. 111, 114, 433 F.2d 1217, 1220 (1970) (per curiam); *see also Noble v. Worthy,* 378 A.2d 674, 676–77 (D.C.1977). "Industry custom and practice are commonly looked to for illumination of the appropriate standard of care in a negligence case." *Erlich v. First Nat'l Bank of Princeton,* 208 N.J.Super. 264, 291, 505 A.2d 220, 234 (1984). "Put more conceptually, proof of a common practice aids in formulating the general expectation of society as to how individuals will act in the course of their undertakings, and thus to guide the common sense or expert intuition of a jury or commission when called on to judge of particular conduct under particu-

lar circumstances." *Trimarco v. Klein,* 56 N.Y.2d 98, 107, 436 N.E.2d 502, 505, 451 N.Y.S.2d 52, 55 (1982) (quoting R. Pound, *Administrative Application of Legal Standards,* 44 ABA Rep. 445, 456–57).

■ Nevertheless, evidence of conformity to industry practice is not conclusive, and cannot set the standard of conduct. *Princemont, supra,* 140 U.S.App.D.C. at 114, 433 F.2d at 1220. To borrow Justice Holmes' pithy formulation,

[w]hat usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not.

*Texas & Pac. Ry. Co. v. Behymer,* 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903).[7] "Much the better view, therefore, is that of the great majority of the cases, that every custom is not conclusive merely because it is a custom, that it must meet the challenge of 'learned reason,' and be given only the evidentiary weight which the situation deserves." PROSSER & KEETON, THE LAW OF TORTS § 33, at 195 (1984). Accordingly, we do not think that the merchants have established their own due care for summary judgment purposes by attempting to equate their own procedures with industry custom. Rather, their motion must stand or fall on deficiencies in Beard's submission.

*D. The Need for Expert Testimony.*

■ At trial, the plaintiff bears the burden of proving negligence by a preponderance of the evidence. He must establish the applicable standard of care, show that the defendant deviated from it, and demonstrate that the defendant's conduct was the proximate cause of his injury. *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C. 1988). The merchants say that Beard's materials in opposition to their motions for summary judgment have not raised a genu-

---

7. *See also T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.), *cert. denied sub nom. Eastern Transportation Co. v. Northern Barge Corp.,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932) (per Learned Hand, J.): [I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests.... Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

ine issue of material fact either regarding the standard of care applicable to their conduct or with respect to any deviation therefrom. We examine the record to determine whether Beard has "go[ne] beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate[d] 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, *supra*, 477 U.S. at 324, 106 S.Ct. at 2553. We conclude that he has not.

■ Where negligent conduct is alleged in a context which is within the realm of common knowledge and everyday experience, the plaintiff is not required to adduce expert testimony either to establish the applicable standard of care or to prove that the defendant failed to adhere to it. *Toy*, *supra*, 549 A.2d at 6; *see also Lenkin-N Ltd. Partnership v. Nace*, 568 A.2d 474, 477–78 (D.C.1990). Expert testimony is required, however, where the subject presented is "so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson." *Toy*, *supra*, 549 A.2d at 6 (quoting *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987)). The rationale for requiring expert testimony was well stated two-thirds of a century ago in a losing cause; courts should not leave it to "a jury of tailors and haberdashers to pass judgment [unaided by expert testimony] on how to make a wet and rolling deck in a seaway a safe place to work." *Zinnel v. United States Shipping Bd. E.F. Corp.*, 10 F.2d 47, 49 (2d Cir.1925) (dissenting opinion).

■ If the plaintiff fails to present sufficient evidence to establish the applicable standard of care, the court must enter judgment for the defendant. *Toy*, *supra*, 549 A.2d at 6; *Meek v. Shepard*, 484 A.2d 579, 581 (D.C.1984). "The fatal defect in plaintiff's case was its failure to adduce any evidence by experts in commercial office construction about the reasonableness of the delay [in preparing premises for occupancy].... [J]urors cannot be expected to reach an informed decision without the aid of such testimony." *Lenkin-N Ltd. Partnership, supra*, 568 A.2d at 478.

The requirement that a plaintiff introduce expert testimony to prove the standard of care where the subject matter is too technical for the lay juror is often associated with medical malpractice cases. *Crain v. Allison*, 443 A.2d 558, 563 (D.C. 1982); *see also* PROSSER & KEETON, *supra*, § 32, at 188:

> [s]ince juries composed of laymen are normally incompetent to pass judgment on questions of medical science or technique, it has been held in the great majority of cases that there can be no finding of negligence in the absence of expert testimony to support it.

It has more recently been applied, however, to a wide variety of situations. *See, e.g., District of Columbia v. Freeman*, 477 A.2d 713, 719 (D.C.1984) ("whether a painted crosswalk is sufficient to render a particular intersection reasonably safe is a determination essentially technical in nature," requiring testimony from experts who could place the evidence "in an appropriate context for the jury"); *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990) (whether prison officials acted reasonably to secure the safety of a prisoner is not within the realm of the everyday experiences of a lay juror; expert testimony is required to establish the standard of care). In the words of a leading commentary,

> any given matter may conceivably be so far out of the range of general experience that a jury will not be allowed to decide on the reasonableness of an actor's conduct without the aid of expert testimony that at least explains to the layperson the esoteric problems and the possibility and practicability of precautions.

3 F. HARPER, F. JAMES, O. GRAY, THE LAW OF TORTS § 17.1, at 547–48 (1986).

■ We think it is beyond the ken of the average lay juror to identify the appropriate standard of care to which retail merchants should be held in processing applications for credit cards. A merchant cannot guarantee the authenticity of an application, but can be required only to utilize reasonable procedures in that regard. *Cf.*

*Koropoulos v. Credit Bureau, Inc.,* 236 U.S.App.D.C. 136, 144, 734 F.2d 37, 45 (1984) (construing federal Fair Credit Reporting Act). To determine whether a procedure is reasonable, it would be helpful to secure an informed assessment of its benefits, and also of its cost, which is likely to be passed on to the consumer. We do not think a lay person can be expected to know what kinds of measures would have the potential for detecting applications filed by unauthorized individuals, or how much it would cost the merchant or, ultimately, the merchant's customers to adopt and utilize such measures, or whether any additional detection which more exacting requirements might achieve would be worth the additional costs. There may be other considerations, besides a cost-benefit assessment, which would be pertinent to this analysis; the ordinary citizen may not even know what questions to ask. These are technical subjects on which jurors need expert advice.

■ Contrary to Beard's invocation of principles of *res ipsa loquitur,* this is not a situation in which it is obvious, without expert assistance, that a merchant must have been negligent if he approved a fraudulent credit card application. "There is no rule of law which requires men [8] in their business transactions to act upon the presumption that all men are knaves and liars, and which declares them guilty of negligence ... whenever they fail to act on that presumption." *Bailey v. Smith,* 57 App. D.C. 369, 371, 23 F.2d 977, 979 (1928). Beard suggests that if the merchants believe that it would be prohibitively expensive to institute more probing processing requirements in light of the small number of fraudulent credit applications received,[9] then they should nevertheless be liable to those few individuals who may be injured because less searching procedures did not detect the fraud. We conclude, however, that such a rule would in effect impose liability without fault. At least in the absence of legislation, the doctrine of strict liability applies only to conditions and activities which are abnormally dangerous to life, limb or property. *See generally,* Prosser & Keeton, *supra,* § 78 at 545–59. Nothing of this kind is involved here.

### E. The Merchants' Alleged Failure to Follow Their Own Procedures.

■ In opposition to the motions for summary judgment, Beard submitted affidavits and exhibits which, according to him, demonstrated that some of the information on these applications was inaccurate. He claimed that these inaccuracies would have been discovered if the merchants had conducted reasonable investigations, or even if they had followed their own stated procedures.

The allegedly incorrect information on which Beard relies is summarized in his brief as follows:

1. *Hecht's application:*

—Roberts listed her current and former addresses and not Beard's address.

—Employment listed for Beard as X-ray Department at Howard University Hospital where Beard did not work.

—Salary listed for Beard was $50,000 while in fact he earned $26,000 in the College of Medicine at Howard University.

2. *Raleigh's application:*

—Roberts listed her address and not Beard's.

—Listed Beard's date of birth as 4–13–36 while his correct date is 9–13–35.

—Listed Beard's social security number as 359–29–3044 while his correct number is 359–26–3044.

—Listed Beard's salary as $42,000 while he earned $26,000.

3. *Woodward & Lothrop:*

—Roberts listed her address and not Beard's.

---

8. Or women.

9. According to Woodward & Lothrop's answers to interrogatories, reports of fraud were received with respect only to fourteen of a total of 800,000 applications.

—Listed Beard's salary as $42,000 while he earned $26,000.

—Listed his social security number as 359–29–3044 while his number is 359–26–3044.[10]

The alleged discrepancies of which Beard complains, however, cannot be discerned from the face of an application. Beard's correct salary, for example, could perhaps have been ascertained by an inquiry to the employer, but Beard has failed to proffer expert testimony from which the court could infer a duty to make such an inquiry. With respect to address, social security number, and date of birth, Beard has offered no evidence that "correct" information, contrary to that on the applications, was in any of these merchants' possession.[11] Finally, nothing in Beard's submission supports the proposition that an error in a single digit of his social security number would place a reasonably prudent merchant on notice that a credit application may be fraudulent.[12]

Under these circumstances, we conclude that Beard's contentions regarding the merchants' alleged failure to adhere to their proclaimed standards do not present a genuine issue of material fact regarding the question whether the merchants were negligent.[13]

## II

## BEARD II

In *Beard II,* Beard and Ms. Elam allege that several of the merchants failed to comply with 16 DCMR § 102.1 (1984), which provides as follows:

> Any person who is a retail seller or a sales finance company shall register with the Office of Consumer Protection (Office) as provided in this section.

Relying on *Family Construction v. District of Columbia Dep't of Consumer and Regulatory Affairs,* 484 A.2d 250 (D.C. 1984), as well as a number of other authorities in which contracts by unlicensed entrepreneurs have been held to be void, these appellants contend that the merchants must return all moneys paid to them for goods sold while the merchants were unregistered, but that the purchasers are entitled to retain the goods. Judge Hannon rejected this somewhat extravagant theory and granted summary judgment in favor of the merchants.

The regulations governing credit retailers of which § 16–102.1 is a part contain a somewhat complex enforcement scheme. The Office of Consumer Protection may seek cease and desist orders. §§ 16–121.1 through 16–121.12. The Corporation Counsel may institute civil proceedings to enforce orders of the Office of Consumer

10. Beard complains that Goodyear failed to produce any application ostensibly submitted by him and that the copies of applications produced by several of the other merchants were illegible. He has presented no authority, however, requiring the merchants to retain copies of such applications. Under these circumstances, there is no basis for drawing an adverse inference against any of the merchants with respect to what those applications would show.

11. Several of the merchants, not including Woodward & Lothrop, routinely requested credit reports. So far as we are able to determine, however, Beard had not attempted to demonstrate that any particular merchant had in its possession information contrary to that on the credit application submitted to that merchant in Beard's name.

12. The merchants also point out that the address which Beard complains was Ms. Roberts' address rather than his own appears on a Credit Bureau report on him which was made a part of the record. They further invite our attention to Beard's testimony that, although his salary was $26,000 per year, he supplemented it with other income.

13. Beard also complains that the trial judge declined to provide him with further opportunity for discovery after the merchants filed their motions for summary judgment. Aside from the discretionary character of such a determination, *see* Super.Ct.Civ.R. 56(f), we perceive no reasonable possibility that further discovery would have alleviated Beard's major problem, namely, the lack of expert testimony.

In Count II of his counterclaim in *Beard I,* Beard alleged that the merchants reported to CBI information which materially misrepresented his credit rating, in violation of D.C.Code § 28–3814(c)(3) (1981). For the reasons stated by Judge von Kann in his written order dated March 21, 1986, we conclude that no genuine issue of material fact was presented with respect to this issue; there was no evidence of willfulness.

Protection. §§ 16–121.10, –121.11. One who violates any provision of the credit retailer regulations may be fined up to $300 or imprisoned for no more than ten days. § 16–122.1. The remedies provided in these regulations are not mutually exclusive. § 16–122.2. Finally,

> [n]othing in this chapter shall prevent any person from exercising any right or seeking any remedy to which he [or she] might otherwise be entitled or from filing any complaint with any other agency.

§ 16–122.3

Conspicuously absent from these regulations are the kinds of rights and remedies which appellants ask us to recognize in *Beard II.* There is no provision authorizing a private party to bring an action in the Superior Court to enforce the regulations, *see Cannon v. Univ. of Chicago,* 441 U.S. 677, 717 (1979); *In re D.G.,* 583 A.2d 160, 166–68 (D.C.1990), nor is there any suggestion that all contracts made while a retailer is unregistered must automatically be treated as void. Generally, a person who has suffered no injury lacks standing to bring a civil action, *Warth v. Seldin,* 422 U.S. 490, 499, 507–08, 95 S.Ct. 2197, 2205, 2209–10, 45 L.Ed.2d 343 (1975) (requiring showing of *injury in fact* ) and nothing in these regulations indicates any disposition on the part of those who wrote these regulations to provide for a different rule. So far as can be discerned from the text, the drafters contemplated enforcement by public officials or through privately initiated administrative proceedings. They also provided for relatively modest penal sanctions. There is no suggestion that civil actions for drastic forfeitures were contemplated.

Appellants acknowledge with commendable candor that they have suffered no injury attributable to the merchants' alleged noncompliance with § 16–102.1.[14] They maintain, however, that "the return of these funds without quantum meruit is a judicial policy devised to assure compliance with the law although the consumer has suffered no damage." This remedy—get

your money back but hang on to the merchandise—would presumably be available, under appellants' theory, to anyone who bought anything on credit (or even, perhaps, for cash) from a retail merchant during the period of non-registration. We surely understate the obvious when we suggest that if, say, Hecht's or Woodward & Lothrop were unregistered for a single Christmas shopping season, the cost of that failure to register would be sufficient to cause quite a stir. We discern nothing in these regulations, or in the legislation which they were designed to implement,[15] that would support the notion that such a remedy was intended to be available to a party who can demonstrate no injury whatever.

 Equity abhors forfeitures. *Berg v. Slaff,* 125 A.2d 844, 846 (D.C.1956). Statutes or regulations which impose forfeitures, or which provide for sanctions disproportionate to the violations or to the damage done, are penal in nature and must be strictly construed. *See generally* 3 N. Singer, Sutherland Statutory Construction § 59.02, at 7–8 (4th ed. 1986). This principle has been applied to consumer credit statutes, *see, e.g., Ford Motor Credit Co. v. Gamez,* 617 S.W.2d 720, 722 (Tex. Civ.App.1980), as well as to licensing requirements of various kinds. *Clymer v. Zane,* 128 Ohio St. 359, 364, 191 N.E. 123, 126 (1934); *Bottomley v. Coffin,* 399 A.2d 485, 488 (R.I.1979). Accordingly, the authority to impose a forfeiture should not be lightly inferred, but should be found to exist only if it is clearly articulated in the authorizing legislation or regulations. *Cf. District of Columbia v. Riggs Nat'l Bank,* 581 A.2d 1229, 1262 (D.C.1990).

 The legislation pursuant to which the retail credit regulations were promulgated provides that *"any consumer who suffers any damage* as a result of [an unlawful trade practice]" shall be entitled to various kinds of enumerated relief.

---

**14.** Indeed, Beard contends that he has not purchased anything from these merchants by use of a properly issued credit card because, he says, he never applied for one.

**15.** *See* D.C.Code § 28–3901 *et seq.* (1981).

D.C.Code § 28–3905(k)(1) (1981). Obviously, suffering damage is a condition precedent to suit, and one who has not been injured cannot sue under this statute for any relief whatever. Nothing in the regulations purports to extend the statutory right to such relief, or, indeed, to any remedy, to an individual who has suffered no injury. In *Curry v. Dunbar House, Inc.,* 362 A.2d 686, 690–91 (D.C.1976), a case in which tenants were seeking relief from their obligation to pay rent because the landlord had failed to secure a housing business license or a certificate of occupancy, this court held that "equitable principles require that the tenants be relieved of their legal obligations to pay rent only to the extent that they actually were harmed." The same principle applies here.

*Family Construction,* on which appellants rely, does not require a contrary result. In that case, a homeowner complained to the Department of Consumer and Regulatory Affairs that a contractor who had failed to register as a credit retailer failed to comply with his obligations to her pursuant to a contract to install windows in her home. The homeowner made a down-payment of $1,000 pursuant to an installment contract. When the contractor failed to make timely delivery of the windows, an administrative law judge held that the homeowner was entitled to void the contract, to recover her down payment, and to require the contractor to restore her premises to their previous condition. In affirming that order, we noted, *inter alia,* that "[t]his court has consistently held that a contract made in violation of a statute designed for police or regulatory purposes is void and does not confer rights upon a wrongdoer." *Family Construction, supra,* 484 A.2d at 254.

■ *Family Construction* did not present the question which we are addressing here, namely, whether a consumer who claims no injury whatever as a result of a transaction with a retailer who was not registered at the time thereof is entitled to have his contract voided on the basis of the nonregistration alone. It is inconceivable to us that the quoted language from *Family Construction* was designed to apply to a case like this one.[16] Accordingly, we affirm Judge Hannon's award of summary judgment with respect to this claim.[17]

16. We have held that an unlicensed home improvement contractor who has accepted payment from a customer before completion of the work is required to return the entire payment, and is barred from recovery for work done even on a *quantum meruit* theory. *See, e.g., Nixon v. Hansford,* 584 A.2d 597 (D.C.1991) and authorities there cited. These decisions are predicated on the express provisions of the applicable regulation, 6 DCMR § 800.1 (1987), which provides that

> no person shall *require or accept any payment* for a home improvement contract in advance of the full completion of all work required to be performed under the contract, *unless that person is licensed* as a home improvement contractor.

(Emphasis added). We are aware of no comparable provision in the retail credit regulations at issue in this case.

17. We deal with the remaining issues summarily. In his order dated February 3, 1987, Judge von Kann declined to award the merchants sanctions pursuant to Super.Ct.Civ.R. 11. We conclude that the judge exercised his discretion judiciously and, for the reasons stated in his order, we affirm the denial of sanctions with respect to the actions of Beard and his counsel addressed in that order. It appears, however, that Judge von Kann did not consider, in ruling on the motion for sanctions, Beard's third motion to amend the complaint to add class action allegations. This motion was denied by Judge Alprin. We have examined this motion and certain correspondence associated with it and are satisfied that counsel's tactics do not rise to the level of a Rule 11 violation. Accordingly, we decline the invitation to remand the case to the trial court for further proceedings on this issue.

We likewise find no merit in Beard's appeal from a discovery order. Beard's tardy answers to interrogatories and Woodward & Lothrop's motion to compel discovery crossed in the mail. Judge Nunzio denied the motion to compel, presumably as moot, but awarded Woodward & Lothrop $150 in counsel fees. If Beard had answered the interrogatories in timely fashion, *the motion to compel would not have been* necessary. We discern no abuse of discretion. *See* Super.Ct.Civ.R. 37; *Firestone v. Harris,* 414 A.2d 526, 527 (D.C.1980). A hearing on the precise amount of the award would have been counter-productive, since counsel's time might well have cost the parties more than the amount awarded. *See Swift v. Swift,* 566 A.2d 1045, 1047 n. 2 (D.C.1989).

## III

For the foregoing reasons, the orders granting summary judgment in *Beard I* and *Beard II*, the order denying Rule 11 sanctions, and the order granting discovery sanctions to Woodward & Lothrop are and each is hereby affirmed.

*So ordered.*